1
2
3
4
5
6
7

8        **UNITED STATES DISTRICT COURT**

9        **EASTERN DISTRICT OF CALIFORNIA**

10

11   MARCO ANTONIO AMBRIZ,            )   Case No.: 1:14-cv-00294-AWI-JLT
                                      )
12           Petitioner,              )   FINDINGS AND RECOMMENDATIONS TO
                                      )   DENY PETITION FOR WRIT OF HABEAS
13       v.                           )   CORPUS (Doc. 1)
     GARY SWARTHOUT, Warden,          )
14                                    )   ORDER DIRECTING THAT OBJECTIONS BE
             Respondent.              )   FILED WITHIN TWENTY-ONE DAYS
15                                    )
                                      )
16   _____

17           In 2010, a jury convicted Petitioner of shooting at an inhabited dwelling, shooting from a

18   motor vehicle at a person, receiving stolen property, and eight counts of assault with a firearm.  The

19   trial court sentenced him to of fifteen years-to-life, which included gang-related enhancements.  In the

20   petition, he alleges various errors he contends occurred at the trial.  For the reasons set forth below, the

21   Court recommends the petition be **DENIED**.

22   **I.       PROCEDURAL HISTORY**

23           After his conviction on November 23, 2010 (Doc. 13, Ex. A), Petitioner appealed to the

24   California Court of Appeals, Fifth Appellate District (the "5th DCA"), which affirmed the conviction.

25   (Id.).   Likewise, the California Supreme Court denied his petition for review.  (Lodged Document

26   ("LD") 24; 25).

27   ///

28   ///

1

## II.        FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the 5th DCA's unpublished decision[1]:

Around 4:00 p.m. on June 23, 2008, the Valdovinos family was startled by six gunshots fired at their home located on North Smith Road. When the shots were fired, Raquel was in the kitchen cooking with her husband Jose and her son Jesus. Raquel's daughter, Maria was in the living room breastfeeding her baby; Maria and her four children were visiting. Maria's daughter was inside watching television and her sons were outside in the backyard. Maria's brothers, Max and Juan Carlos, also were in the backyard. Jesus's girlfriend, Salina E., was resting in the garage, which had been converted into living quarters for Jesus and her.

The first three or four shots were in close succession; after a pause, more shots were fired. One of the shots hit the garage door and another shot hit near the cooler inside the garage next to where Salina E. was standing. The bullets that penetrated the garage made the mirror on the wall wobble.

Immediately upon hearing the shots, Juan Carlos ran to the chainlink fence on the north side of the property and saw a red car heading east on Olive Avenue at a high rate of speed. When Maria heard the shots, she stood up and, while holding her baby, she opened the front door. There was smoke in the air just outside the front door. Maria gathered her children and the entire Valdovinos family went outside to the front of the house, where they shortly were met by police officers.

Maria had parked her minivan directly in front of the Valdovinos house. After the shots were fired, she discovered a bullet hole in the back of the minivan. Juan Carlos's Camaro, also parked in the front of the house, had a bullet hole in it. There was a bullet hole in the garage and gunshot marks on the house. Several other vehicles were parked in front of the house.

At about the same time, Tulare County Sheriff's Detective Jesse Cox was conducting an interview at a nearby house on North Newman Road. After Cox finished the interview, he was walking back to his car when he heard six gunshots coming from a northwest direction. As he was getting into his car, Sheriff's Deputy Javier Guerrero pulled alongside Cox in a marked patrol vehicle. Cox told Guerrero about the gunshots; Guerrero told Cox he had just seen a vehicle, which he identified in his report as a red, four-door Honda Accord, leaving the area where shots had been fired.

Before meeting up with Cox, Guerrero had seen the red four-door Honda Accord traveling northbound on North Smith Street headed toward Olive Avenue. The vehicle caught his attention because it failed to stop at a stop sign and was traveling in excess of 40 miles per hour. Inside the Accord were three Hispanic males, all with shaved heads. Guerrero observed the person in the back seat lean out the window and yell something toward the house on the corner of North Smith Road and Olive Avenue. Guerrero did not stop the vehicle because he was en route to meet Cox.

---

[1] The 5th DCA's summary of the facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1). Thus, the Court adopts the factual recitations set forth by the 5th DCA.

Cox advised dispatch of the firing of gunshots in the vicinity, while Guerrero broadcast a description of the Accord. The two officers drove toward North Smith Road and Olive Avenue, which was 15 to 20 seconds away. Guerrero stopped to speak with the people gathered outside the house; Cox drove off to attempt to locate the Accord.

Shortly after 4:00 p.m. that same day, Sheriff's Deputy Carl Bostai saw a reddish brown colored vehicle matching the description broadcast by dispatch. There were three people in the car. Bostai made a U-turn and activated his siren in order to make a traffic stop. Initially, the Honda Accord failed to stop and Bostai had to engage in a high-speed chase.

When the Honda Accord approached a residence on Road 136, it slowed and the passengers looked around. The rear passenger, Noel, looked back toward the deputy. Marco was the front seat passenger and Ramirez was driving the Accord. Bostai saw Marco reach out the front passenger window and throw an object towards the residence on Road 136. By this time, other officers had arrived on the scene and a felony stop of the vehicle was made.

Bostai searched the area where he had seen Marco throw an object out the window. He found a .357 revolver in a pile of grass clippings. When he opened the cylinder, there were six dispensed casings and no live ammunition in the gun.

Bostai also placed a brown paper bag over the suspects' hands to preserve any gunshot residue. A subsequent test of each of the suspects' hands was negative for gunshot residue.

Sheriff's Detective Bobby Saldana documented a total of five bullet holes at the house on North Smith Road. He located one in the minivan, one in the Camaro, and a total of three in the garage door and stucco. There were no casings, indicating the weapon might be a revolver because revolvers do not leave casings after being fired.

Ramirez was interviewed by Sheriff's Detective Rodney Klassen the evening of June 23, 2008, after waiving his rights pursuant to Miranda v. Arizona (1966) 384 U.S. 436 (Miranda). Ramirez admitted being a Sureno gang member, but denied having a gun or knowing anything about the events surrounding the shooting. Ramirez was aware something was thrown out of the car window when the police were chasing him, but denied knowing what was thrown.

Klassen also interviewed Marco after Marco waived his Miranda rights.  Marco told Klassen one of his "homies" had been shot the week before by the people who lived in the house on North Smith Road. Marco acknowledged that the "Nortenos own the whole street" and you only go down the street to cause problems for the Nortenos. When asked if he had a gun, Marco responded, "I don't know."

The gun found on Road 136 was dusted for fingerprints, but none were recovered.  The gun had been listed as stolen by the Department of Justice.

The Accord, which belonged to Ramirez's father, was towed and stored in an inside storage area. The day after the shooting the Accord was processed for gunshot residue, which was found on the exterior of the front passenger door and the headliner of the rear seat.

3

Ramirez, Marco and Noel were charged with (1) shooting at an inhabited dwelling, in violation of Penal Code section 246,2 (2) shooting from a motor vehicle, in violation of section 12034, subdivision (c), (3) eight counts of assault with a firearm, in violation of section 245, subdivision (a)(2), and (4) receipt of stolen property, in violation of section 496, subdivision (a). It also was alleged that the crimes were committed for the benefit of a criminal street gang, in violation of section 186.22, subdivision (b), and that the defendants personally used a firearm in the commission of the assault offenses.

The information also alleged Noel was at least 14 years old and eligible to be prosecuted as an adult with respect to the count 1 offense, shooting at an inhabited dwelling. Initially, Noel's motion to sever his trial from that of his codefendants was granted; however, the trial court reconsidered the motion and, ultimately, all three defendants were tried jointly.

Department of Justice Senior Criminalist Nancy McCombs has been a forensic scientist for 20 years and previously has qualified as an expert witness in ballistics. McCombs examined three bullet fragments, a bullet, and a .357 revolver that had been sent to her for testing. McCombs was unable to determine if the fragments were fired from the revolver, but concluded that the bullet was fired from the revolver.

Max associated with Norteno gang members. He acknowledged that Sureno gang members were rivals. Max was aware that Ramirez was a Sureno. Max and Ramirez had gotten into a fistfight in September 2007. In February 2008, Max was involved in a Norteno–Sureno fight at a local high school. A student was stabbed and Max cooperated with the police in their investigation of the stabbing. Max's brother, Jesus, also associated with Nortenos.

Sheriff's Deputy Michael Yandell was qualified to testify as a gang expert. Yandell testified extensively about the Norteno and Sureno gangs and their activities.

A jury convicted defendants of all charges and found the gang enhancements to be true. The jury could not reach an agreement on the personal use of a firearm enhancement.

All three defendants were sentenced to a term of 15 years to life for the count 1 offense, with the term for the count 11 offense to run concurrently. The terms for counts 2 through 10 were stayed pursuant to section 654. Various fines also were imposed and credits awarded.

(Doc. 13, Exh. A ("Ex. A"), pp. 3-5).

III.    **DISCUSSION**

A.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3);  Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States

4

1    Constitution.  The challenged conviction arises out of the Tulare County Superior Court, which is

2    located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

3          On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996

4    ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v.

5    Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997); Jeffries v. Wood, 114

6    F.3d 1484, 1500 (9th Cir. 1997), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other grounds by*

7    Lindh v. Murphy, 521 U.S. 320 (holding the AEDPA only applicable to cases filed after statute's

8    enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed

9    by its provisions.

10         B.      Legal Standard of Review

11         A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the

12   petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was

13   contrary to, or involved an unreasonable application of, clearly established Federal law, as determined

14   by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an

15   unreasonable determination of  the facts in light of the evidence presented in the State court

16   proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S.

17   at 412-413.

18         A state court decision is "contrary to" clearly established federal law "if it applies a rule that

19   contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts

20   that is materially indistinguishable from a [Supreme Court] decision but reaches a different result."

21   Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams, 529 U.S. at 405-406 (2000).

22         In Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court

23   explained that an "unreasonable application" of federal law is an objective test that turns on "whether

24   it is possible that fairminded jurists could disagree" that the state court decision meets the standards set

25   forth in the AEDPA. The Supreme Court has "said time and again that 'an *unreasonable* application of

26   federal law is different from an *incorrect* application of federal law.'" Cullen v. Pinholster, 131 S.Ct.

27   1388, 1410-1411 (2011).  Thus, a state prisoner seeking a writ of habeas corpus from a federal court

28   "must show that the state court's ruling on the claim being presented in federal court was so lacking in

5

justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Harrington, 131 S.Ct. at 787-788.

The second prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. at 520; Jeffries v. Wood, 114 F.3d at 1500. A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Id.; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)(holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

**III.    Review of Petitioner's Claims**

Petitioner alleges the following as grounds for relief: (1) trial court erred in failing to conduct a Kelly hearing and limit firearms expert's testimony; (2) prosecutorial misconduct regarding McComb's testimony and failure of the trial court to give a curative instruction; (3) prosecutorial misconduct in eliciting evidence; (4) error by trial court in failing to give CALCRIM Nos. 357 and 358; and (5) insufficient evidence to support assault with a firearm convictions. (Doc. 1, pp. 4-5).

A.    Failure to Conduct A Kelly Hearing Or Limit Expert's Testimony

Petitioner first contends that the trial court erred in failing to conduct a hearing regarding the testimony of a prosecution expert witness or, alternatively, to limit that witness's testimony. This

6

1  contention is without merit.

2        1. The 5th DCA's Opinion.

3  The 5th DCA rejected Petitioner's argument as follows:

4  Defendants filed a motion in limine to exclude or limit the testimony of the prosecution's bullet
   comparison expert. The motion asserted potential testimony that the ballistics expert was able
5  to match one of the bullets found at the scene with a bullet test fired from the gun recovered by
   the police was unreliable because bullet comparison evidence generally is not accepted in the
6  scientific community.

7  At the hearing on the motion in limine, defense counsel objected to the ballistics expert
   testifying that the bullet found at the shooting was fired from the gun recovered by the police.
8  Defense counsel had no objection, however, to expert testimony that the bullet found at the
   scene had all the characteristics consistent with the rifling of the gun recovered by the police.

9
   The trial court ultimately ruled that the firearms/ballistics expert could testify that the markings
10 on the bullet recovered from the scene of the shooting were consistent with it being fired from
   the gun recovered by the police at the time of Marco's arrest. The trial court ruled that no Kelly
11 hearing would be held.  At a subsequent in limine hearing, the trial court ruled that the
   ballistics expert could testify that the recovered bullet was fired from the gun recovered by the
12 police "or a gun just like this gun."

13 Under the Kelly doctrine, evidence based on a new scientific method must satisfy three
   requirements before it may be admitted: (1) the technique generally must be accepted in the
14 scientific community; (2) the expert witness must be qualified to give an opinion; and (3)
   correct scientific procedures must have been used. (People v. Leahy (1994) 8 Cal.4th 587, 594
15 (Leahy ).) The party offering the evidence has the burden of proof. (People v. Diaz (1992) 3
   Cal.4th 495, 526.)

16
   Defendants contend the trial court erred in not conducting a Kelly hearing prior to accepting
17 testimony from the expert, McCombs. On appeal, defendants assert that none of the three
   prongs of the Kelly test were satisfied. In the trial court, however, no challenge was raised to
18 the second and third prongs of the Kelly test; rather, only the first prong of the Kelly test was
   challenged. Any challenges to the second and third prongs of the Kelly test are forfeited for
19 failure to raise them in the trial court. (People v. Clark (1993) 5 Cal.4th 950, 1018.)

20 With respect to defendants' contention that bullet comparison evidence generally is not
   accepted in the scientific community and therefore does not meet the first prong of the Kelly
21 test, the California Supreme Court has decided this issue adversely to the defendants' position.
   In People v. Cowan (2010) 50 Cal.4th 401, the court found that the technique of ballistics
22 comparisons is a procedure that isolates physical evidence whose existence, nature,
   appearance, and meaning laypersons are able to grasp and evaluate. (Id. at p. 470.) Under these
23 circumstances, the reliability of the process used to process the physical evidence—the
   comparison of bullets—is not subject to a Kelly hearing. (Ibid.; see also People v. Eubanks
24 (2011) 53 Cal.4th 110, 140–141; People v. Venegas (1998) 18 Cal.4th 47, 81.)

25 Kelly applies "'to that limited class of expert testimony which is based, in whole or part, on a
   technique, process, or theory which is new to science and, even more so, the law.' [Citation.]"
26 (Leahy, supra, 8 Cal.4th at p. 605, quoting People v. Stoll (1989) 49 Cal.3d 1136, 1156.)
   Ballistics and firearms comparisons are neither new to the law or the scientific community.
27 (See People v. Benson (1989) 210 Cal.App.3d 1223, 1227 [expert testimony on ballistics
   admitted without objection].)

28
                                              7

1
2

> Thus, defendants' contention that the trial court erred in not holding a <u>Kelly</u> hearing prior to allowing the expert to testify fails. In a related claim, defendants contend that McCombs's testimony should have been stricken or a curative admonition given because it exceeded the scope of the pretrial order and eliciting the testimony constituted prosecutorial misconduct.

3

4

(Ex. A, pp. 6-7).

5

          2.  <u>Federal Standard And Analysis</u>.

6

      In <u>People v. Kelly</u>, 17 Cal.3d 24 (1976), the California Supreme Court reaffirmed that, in

7

California, the test for admissibility of expert testimony based on the application of a new scientific

8

technique comported with what was then the federal test, as set forth in <u>Frye v. United States</u>, 293 F.

9

1013, 1015 (D.C. Cir. 1923). Under the <u>Kelly</u> standard, the advocate of a new science method must

10

establish that: 1) the reliability of the method is generally accepted; 2) the expert witness is qualified;

11

and 3) the correct scientific procedures were used. <u>Kelly</u>, 17 Cal.3d at 30. The <u>Frye</u> test has since been

12

superceded as to admissibility of scientific evidence in federal courts by the test announced in <u>Daubert</u>

13

<u>v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 594–95 (1993). Because this is a federal habeas

14

corpus case, this Court cannot determine whether the expert testimony was properly admitted under

15

state law, <u>see Estelle v. McGuire</u>, 502 U.S. 62, 67–68 (1991), and the Court will not consider whether

16

the evidence passed muster under the Federal Rules of Evidence or <u>Daubert</u>, which was not decided on

17

constitutional grounds, <u>see Wilson v. Sirmons</u>, 536 F.3d 1064, 1101–02 (10th Cir.2008) ("<u>Daubert</u> does

18

not set any specific constitutional floor on the admissibility of scientific evidence."); <u>Kinder v.</u>

19

<u>Bowersox</u>, 272 F.3d 532, 545 n. 9 (8th Cir.2001) ("<u>Daubert</u> does not bind the states, which are free to

20

formulate their own rules of evidence subject only to the limits imposed by the Constitution.");

21

<u>Humphrey v. Hill</u>, 2014 WL 950468 at *12 (C.D. Cal. March 11, 2014)(<u>Kelly</u> standard is a state law

22

and does not support habeas relief); <u>Adams v. Jacquez</u>, 2011 WL 3563158, at *20 (E.D.Cal. Aug.11,

23

2011) (court may not determine whether admission of evidence under <u>Kelly</u> standard warranted habeas

24

relief because it was a matter of state law and, in any event, admission did not render trial

25

fundamentally unfair); <u>Orozco v. Kramer</u>, 2009 WL 1033610, at *9 (C.D.Cal. Apr.14, 2009) ("The

26

<u>Kelly–Frye</u> rule is a creature of California law, based on a state court ruling adopting the reasoning of a

27

federal circuit court, which was not based on the United States Constitution.").

28

      Petitioner does not appear to argue to the contrary.  Rather, Petitioner notes that California has

8

1  continued to use the <u>Kelly/Frye</u> test in lieu of the <u>Daubert</u> test, thus confirming that it is a state rule, not

2  one of federal dimension.  In his Traverse, Petitioner responds to Respondent's argument only by

3  noting that the three-pronged <u>Kelly/Frye</u> test was not satisfied; however, Petitioner does not offer any

4  federal constitutional basis for affording habeas relief premised solely on the state court's failure to

5  properly apply a state rule or test.

6     State evidentiary rulings are not cognizable in a federal habeas proceeding unless the admission

7  of the evidence violated the petitioner's due process right to a fair trial. <u>Estelle</u>, 502 U.S. at 68. In order

8  to prevail, Petitioner must show that the state court's ruling was so prejudicial that it rendered his trial

9  fundamentally unfair. <u>Id</u>. Although Petitioner argues that the admission of the firearms expert's

10  testimony violated the due process requirement of "fairness" in identification procedures, he may not

11  transform a state-law issue into a federal one merely by asserting a violation of due process. <u>Langford</u>

12  <u>v. Day</u>, 110 F.3d 1380, 1389 (9th Cir.1996). Petitioner is therefore not entitled to relief on this claim.

13     B.  <u>Prosecutorial Misconduct And Lack of Curative Instruction</u>

14       1. <u>The 5th DCA's Opinion</u>

15   Defendants contend the prosecutor committed misconduct when he elicited testimony from
16  McCombs, in violation of a pretrial order, and that the prosecutor engaged in systematic
   misconduct warranting a mistrial. In a related argument, defendants claim the trial court erred in
17  refusing to give defense-requested instructions on prosecutorial misconduct. We disagree.

18  **Failure to object**

19   When the prosecutor was eliciting testimony from McCombs, which defendants claim was
   elicited in violation of the pretrial order, no objection was raised that this constituted
20  prosecutorial misconduct. The general rule is that a defendant may not complain on appeal of
   prosecutorial misconduct unless, in a timely fashion, the defendant "made an assignment of
21  misconduct and requested that the jury be admonished to disregard the impropriety." (<u>People v.
   Samayoa</u> (1997) 15 Cal.4th 795, 841.)  Consequently, any claim of prosecutorial misconduct
22  based upon the questioning has been forfeited. (<u>Ibid</u>.)

23   Regardless, the trial court was well within discretionary bounds when it refused to issue a
   curative admonition crafted by defense counsel. (<u>See People v. Dykes</u> (2009) 46 Cal.4th 731,
24  809.) The prosecutor had moved to strike, and the trial court struck, McCombs's statement—"[I]
   had no doubt"—of the identification of the weapon, which is the crux of the testimony
25  complained of by defendants. After striking the testimony, the trial court denied a request that it
   issue a curative instruction crafted by defense counsel on the basis that issuing the proffered
26  instruction would create further confusion and draw attention to the matter. Furthermore, the
   jury was instructed with CALCRIM No. 104, which includes the statement, "If I order
27  testimony stricken from the record, you must disregard it and must not consider that testimony
   for any purpose."

28  (Ex. A, pp. 9).

2.  Federal Standard

State courts may decline to review a claim based on a procedural default. Wainwright v. Sykes, 433 U.S. 72, 86–87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).  Federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." Coleman v. Thompson, 501 U.S. 722, 729, 111 S.Ct. 2546 (1991); LaCrosse v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001); see Ylst v. Nunnemaker, 501 U.S. 797, 801 (1991); Park v. California, 202 F.3d 1146, 1150 (2000) ("A district court properly refuses to reach the merits of a habeas petition if the petitioner has defaulted on the particular state's procedural requirements . . . ."); see also Fox Film Corp. v. Muller, 296 U.S. 207, 210 (1935).  This concept has been commonly referred to as the procedural default doctrine.  This doctrine of procedural default is based on concerns of comity and federalism.  Coleman, 501 U.S. at 730-32.  If the court finds an independent and adequate state procedural ground, "federal habeas review is barred unless the prisoner can demonstrate cause for the procedural default and actual prejudice, or demonstrate that the failure to consider the claims will result in a fundamental miscarriage of justice." Noltie v. Peterson, 9 F.3d 802, 804-805 (9th Cir. 1993); Coleman, 501 U.S. at 750; Park v. California, 202 F.3d 1146, 1150 (9th Cir. 2000).

The mere occurrence, however, of a procedural default will not necessarily bar a federal court from reviewing claims in a petition for writ of habeas corpus.  In order for the procedural default doctrine to apply and thereby bar federal review, the state court determination of default must be grounded in state law that is both *adequate* to support the judgment and *independent* of federal law. Ylst, 501 U.S. at 801; Coleman, 501 U.S. at 729-30; see also Fox Film Corp., 296 U.S. at 210.  Put another way, the procedural default doctrine will apply only if the application of the state procedural rule provides "an adequate and independent state law basis" on which the state court can deny relief. Park, 202 F.3d at 1151, *quoting*, Coleman, 501 U.S. at 729-30.

"For a state procedural rule to be 'independent,' the state law basis for the decision must not be interwoven with federal law." LaCrosse v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001) (*citing* Michigan v. Long, 463 U.S. 1032, 1040-41 (1983)); Morales v. Calderon, 85 F.3d 1387, 1393 (9th Cir. 1996) ("Federal habeas review is not barred if the state decision 'fairly appears to rest primarily on

1   federal law, or to be interwoven with federal law.'" (*quoting* <u>Coleman</u>, 501 U.S. at 735,)).  "A state law

2   is so interwoven if 'the state has made application of the procedural bar depend on an antecedent ruling

3   on federal law [such as] the determination of whether federal constitutional error has been committed.'"

4   <u>Park</u>, 202 F.3d at 1152 (*quoting* <u>Ake v. Oklahoma</u>, 470 U.S. 68, 75 (1985)).

5           To be deemed adequate, the state law ground for decision must be well-established and

6   consistently applied.  <u>Poland v. Stewart</u>, 169 F.3d 573, 577 (9th Cir. 1999) ("A state procedural rule

7   constitutes an adequate bar to federal court review if it was 'firmly established and regularly followed'

8   at the time it was applied by the state court.")(*quoting* <u>Ford v. Georgia</u>, 498 U.S. 411, 424 (1991)).

9   Although a state court's exercise of judicial discretion will not necessarily render a rule inadequate, the

10  discretion must entail "'the exercise of judgment according to standards that, at least over time, can

11  become known and understood within reasonable operating limits.'"  <u>Id</u>. at 377 (*quoting* <u>Morales</u>, 85

12  F.3d at 1392).

13          California law requires that, with certain exceptions, appellate courts will not consider claims of

14  error that could have been, but were not, raised in the trial court.  <u>People v. Vera</u>, 15 Cal.4[th] 269, 275

15  (1997).  That rule has been deemed both independent of federal law, <u>People v. Williams</u>, 16 Cal.4[th]

16  153, 208 (1997), and consistently applied.  <u>Melendez v. Pliler</u>, 288 F.3d 1120, 1125 (9th Cir. 2002).

17                    3.  <u>Analysis</u>.

18          Respondent contends that the state court properly rejected Petitioner's claim as "waived"

19  because, though Petitioner's counsel objected to the eliciting of McCombs' expert opinion in violation

20  of the court's prior order, no timely objection was made on the grounds of prosecutorial misconduct,

21  thus precluding federal habeas review.  The Court agrees.

22          The record establishes that defense counsel objected to the question asked by the prosecutor and

23  the precise answer given by McCombs.  The objection was sustained and the answer stricken on the

24  grounds that the question and answer went beyond the pre-trial agreement regarding testimony on that

25  subject.  No objection was made regarding *prosecutorial misconduct* in the posing of questions to

26  McCombs.  Because defense counsel failed to tender a timely objection on the grounds of prosecutorial

27  misconduct, the state court's determination that the claim has been procedurally defaulted bars federal

28  review in this case.

As to the trial court's failure to give the jury a curative instruction, the 5th DCA reasoned that no curative instruction was necessary when the objection was sustained and the answer stricken. This was a reasonable legal conclusion. Moreover, the jury was instructed not to consider stricken testimony for any purpose. As Respondent correctly notes, jurors are presumed to follow the judge's instructions. E.g., Richarson v. Marsh, 481 U.S. 200, 211 (2000). Petitioner has not offered any evidence, and the record discloses no suggestion, that jurors did not understand and apply the court's instruction regarding stricken testimony. Accordingly, this claim should be rejected.

C.   Prosecutorial Misconduct in Eliciting Evidence

1.   The 5th DCA's Opinion

Defendants contend the prosecutor engaged in a pattern of systematic misconduct when he elicited detailed information about crimes committed by a Sureno gang member in an effort to establish the predicate offenses to show a pattern of gang activity.

Defendants objected to the level of detail elicited by the prosecutor, requested a conference outside the presence of the jury, and moved for a mistrial. The trial court expressed some concern over the level of detail, but denied the mistrial motion. The trial court struck all the testimony related to the Sureno gang member. The trial court instructed the jury to disregard the stricken testimony and further instructed the jury: "[I]t's not to be considered by you for any purposes." Defendants have failed to establish prosecutorial misconduct; consequently, we conclude the trial court did not err in denying their motion for a mistrial on this basis.

The standard for assessing claims of prosecutorial misconduct is well settled:

"'"[T]he applicable federal and state standards regarding prosecutorial misconduct are well established. '"A prosecutor's ... intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.'"' [Citation.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves '"the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'"' [Citation.] ... [W]hen the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion."' [Citation.]" (People v. Ayala (2000) 23 Cal.4th 225, 283–284.)

First, the prosecutor's elicitation of details about predicate offenses does not constitute misconduct. In the case of In re Alexander L. (2007) 149 Cal.App.4th 605, 611–614, the gang expert testified only to general offenses committed by the gang and to a predicate offense in which the alleged gang member actually was acquitted of the gang allegation. (Id. at pp. 611–612.) A second predicate offense involved a gang member involved in an assault, but no direct link was made as to how the offense was connected to the gang. (Id. at pp. 612–613.) The appellate court concluded the expert's "conclusory testimony cannot be considered substantial evidence as to the nature of the gang's primary activities." (Id. at p. 612.) Similar conclusions were reached by the appellate court in In re Nathaniel C. (1991) 228 Cal.App.3d 990, 1003 and In re Leland D. (1990) 223 Cal.App.3d 251, 259. The prosecutor need not restrict testimony on predicate gang offenses to conclusory and incomplete information.

Second, the trial court struck the testimony to which defendants had objected and admonished the jury not to consider the stricken testimony for any purpose. In the absence of evidence to the contrary, and there is none in the record, we presume the jury abided by the trial court's admonition and instruction. (People v. Stitely (2005) 35 Cal.4th 514, 559.)

The other instance which defendants claim constituted systematic prosecutorial misconduct was when the prosecutor was questioning the woman who lived at the house where the weapon was thrown after the shooting. The prosecutor asked a question of the witness, there was an objection, and the objection was sustained. The prosecutor attempted to rephrase the question, there was an objection, and the objection was sustained. The prosecutor then abandoned this line of questioning and commenced asking questions on an entirely different subject matter. Two questions, which were objected to on the grounds of relevance, and the objections were sustained by the trial court, simply do not qualify as misconduct. (People v. Navarette (2003) 30 Cal.4th 458, 506.)

There was no pattern of misconduct warranting a mistrial and the trial court properly denied the motion.

(Ex. A, pp. 9-10).

            2.      Federal Standard

A habeas petition will be granted for prosecutorial misconduct only when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 171 (1986 (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)); see, Bonin v. Calderon, 59 F.3d 815, 843 (9th Cir. 1995). To constitute a due process violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." Greer v. Miller, 485 U.S. 756, 765 (1987) (quoting United States v. Bagley, 473 U.S. 667 (1985)). Under this standard, a petitioner must show that there is a reasonable probability that the error complained of affected the outcome of the trial - i.e., that absent the alleged impropriety, the verdict probably would have been different.

Petitioner asserts that the prosecutor's attempt to solicit inadmissible evidence is a basis for relief. However, this could constitute a basis for relief only if a specific federal constitutional guarantee is violated or the error is of such magnitude that it results in a denial of fundamental due process and the right to a fair trial. See Estelle, 502 U.S. at 67; Colley v. Sumner, 784 F.2d 984, 990 (9th Cir. 1984); Jefferies v. Blodgett, 5 F.3d 1180, 1192 (9th Cir. 1993). State law foundational and admissibility questions raise no federal question. Johnson v. Sublett, 63 F.3d 926, 930 (9th Cir. 1995). Since this ground for relief pertains to an issue of evidentiary error, Petitioner fails to raise a federal question as required for federal habeas review.

13

1    However, in <u>Payne v. Tennessee</u>, the Supreme Court stated that if evidence introduced at a

2    criminal trial "is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process

3    Clause of the Fourteenth Amendment provides a mechanism for relief."  501 U.S. 808, 825 (1991)

4    (citing <u>Darden v. Wainwright</u>, 477 U.S. 168, 170-83 (1986)).  <u>Darden</u> provides that the "relevant

5    question" is whether admission of the challenged evidence "so infected the trial with unfairness as to

6    make the resulting conviction a denial of due process."  477 U.S. at 181; <u>Romano v. Oklahoma</u>, 512

7    U.S. 1, 12 (1994) ("The relevant question in this case . . . is whether the admission of evidence

8    regarding petitioner's prior death sentence so infected the sentencing proceeding with unfairness as to

9    render the jury's imposition of the death penalty a denial of due process").

10              3.    <u>Analysis</u>

11    As the 5th DCA noted, Petitioner's argument is, in essence, that the prosecutor elicited too

12    much detail regarding the predicate gang offenses from a gang expert witness.  The trial court stated

13    its concern with the level of detail, eventually striking some of the testimony.  In another incident, the

14    prosecutor asked several questions of a witness who owned the property where one of the guns used in

15    the crime was found, related to the presence of the owner's children and their ages.  The court

16    sustained objections on twice, whereupon, the prosecutor rephrased the question again.  Collectively,

17    Petitioner argues that this constitutes a "pervasive pattern of intentional and cumulative misconduct."

18    (Doc. 1, p. 20).

19    Petitioner does not contend that the elicitation of predicate gang offense evidence itself was

20    improper, as this is a required part of the prosecution's case regarding gang enhancements.  Instead,

21    Petitioner objects only to the level of detail.  Exercising its discretion, the trial court prohibited further

22    details from being elicited and struck part of the expert's testimony.  Nothing about the excessive

23    detail, which the jurors were expressly instructed to disregard for all purposes, shows prosecutorial

24    misconduct.  Certainly, it does not show misconduct "of sufficient significance to result in the denial

25    of the defendant's right to a fair trial."  <u>Greer v. Miller</u>, 485 U.S. at 765.  Nor does such detail establish

26    a reasonable probability that the error complained of affected the outcome of the trial - i.e., that absent

27    the alleged impropriety, the verdict probably would have been different. Finally, the Court agrees with

28    the 5th DCA that the prosecutor's actions in attempting to rephrase the question after objections to two

14

1   earlier attempts were successfully sustained, "simply do not qualify as misconduct."  Even if some

2   marginal misconduct could be inferred from this record, it is harmless, i.e., it did not have a

3   "substantial and injurious" effect on the outcome of the trial.  Brecht v. Abrahamson, 507 U.S. 619,

4   637 (1993);

5            D.    Instructional Error

6                  1.    The 5th DCA's Opinion.

7
8   Marco was interviewed by Klassen at the Pixley station. Marco made statements to Klassen that
    were not recorded or transcribed. Marco never admitted involvement in the crimes. When asked
    if he had a gun, his response was "I don't know." Marco admitted that one of his "homies" had
9   been shot in the leg a week earlier. Marco also stated that the Nortenos were known to "own"
    the street where the shooting took place and a person would not go down that street except to
10  cause problems for the Nortenos.

11  **CALCRIM No. 357**

12  Defendants claim the trial court had a sua sponte duty to provide a cautionary instruction with
    CALCRIM No. 357 on adoptive admissions. CALCRIM No. 357 provides:

13
            "If you conclude that someone made a statement outside of court that (accused the
14          defendant of the crime/ [or] tended to connect the defendant with the commission of the
            crime) and the defendant did not deny it, you must decide whether each of the following
15          is true: [¶] 1. The statement was made to the defendant or made in (his/her) presence; [¶]
            2. The defendant heard and understood the statement; [¶] 3. The defendant would, under
16          all the circumstances, naturally have denied the statement if (he/she) thought it was not
            true; [¶] AND [¶] 4. The defendant could have denied it but did not. [¶] If you decide
17          that all of these requirements have been met, you may conclude that the defendant
            admitted the statement was true. [¶] If you decide that any of these requirements has not
18          been met, you must not consider either the statement or the defendant's response for any
            purpose. [¶] [You must not consider this evidence in determining the guilt of (the/any)
19          other defendant [s].]"

20  The Bench Notes to CALCRIM No. 357 state: "The court has a sua sponte duty to instruct on
    the foundational requirements for adoptive admissions if such evidence is admitted." (Judicial
21  Council of Cal., Crim. Jury Instns. (2011) Bench Notes to CALCRIM No. 357, p. 130; see also
    People v. Vindiola (1979) 96 Cal.App.3d 370, 382, citing People v. Atwood (1963) 223
22  Cal.App.2d 316, 332–334; People v. Humphrey (1986) 185 Cal.App.3d 1315, 1336.)

23  At the conference on instructions, the trial court stated it would be instructing the jury with
    CALCRIM No. 357; defense counsel objected. Once the trial court stated it would be
24  instructing with CALCRIM No. 357, thus overruling the objection, defendants did not offer or
    request any modification or clarification of CALCRIM No. 357. The burden was on the
25  defendants to request appropriate clarifying or amplifying language if they felt it was necessary.
    (People v. Andrews (1989) 49 Cal.3d 200, 218.) Having failed to do so, defendants' claim that
26  the language of CALCRIM No. 357 should have been amplified or modified is not cognizable
    on appeal.

27
28
                                          15

**CALCRIM No. 358**

Defendants claim the trial court had a sua sponte duty to instruct the jury with CALCRIM No. 358, which states:

> "You have heard evidence that the defendant made [an] oral or written statement[s] (before the trial/while the court was not in session). You must decide whether the defendant made any (such/of these) statement[s], in whole or in part. If you decide that the defendant made such [a] statement[s], consider the statement[s], along with all the other evidence, in reaching your verdict. It is up to you to decide how much importance to give to the statement[s]. [¶] [Consider with caution any statement made by (the/a) defendant tending to show (his/her) guilt unless the statement was written or otherwise recorded.]"

The trial court has a duty to instruct the jury sua sponte with CALCRIM No. 358 when there is evidence of an out-of-court oral statement by the defendant. (People v. Beagle (1972) 6 Cal.3d 441, 455–456.) The portion of the instruction directing the jury to view with caution an out-of-court statement made by a defendant tending to show guilt also must be given sua sponte. (Ibid.) The admonition to view a defendant's statements with caution applies only to incriminating statements made by a defendant. (People v. Slaughter (2002) 27 Cal.4th 1187, 1200.) The cautionary instruction is intended to assist a jury in determining whether or not a statement actually was made by the defendant. (People v. Carpenter (1997) 15 Cal.4th 312, 393 (Carpenter ).)

There was no request to give CALCRIM No. 358 and no discussion of this instruction in the trial court, perhaps because defendants took the position that the statements to Klassen were not admissions.

Assuming the trial court's failure to instruct the jury with CALCRIM No. 358 in this case was error, it was not prejudicial. Failure to provide the cautionary instruction is not prejudicial where it is not reasonably probable the defendant would have achieved a more favorable result absent the error. (Carpenter, supra, 15 Cal.4th at p. 393.) Where there is no conflict in the evidence, but simply a denial by the defendant of the statements attributed to him or her, the Supreme Court has found a failure to give the cautionary instruction to be harmless error. (People v. Dickey (2005) 35 Cal.4th 884, 905–907 (Dickey).)

In determining whether there has been any prejudice from failure to instruct with CALCRIM No. 358, we look to whether there was any conflict about whether the statements were made or accurately reported. (People v. Pensinger (1991) 52 Cal.3d 1210, 1268.) Here, there is no conflict in the evidence. There is no claim on appeal that the statements were not made or that Klassen's testimony regarding the statements was in any way inaccurate.

We also look to other instructions given to the jury in assessing prejudice. (People v. Sanders (1995) 11 Cal.4th 475, 536–537.) Here, the trial court instructed the jury on its responsibility to assess the credibility of witnesses (CALCRIM No. 226) and with CALCRIM No. 359, stating that a defendant cannot be convicted based on out-of-court statements alone.

There was no challenge to Klassen's veracity in the trial court and no challenge to his credibility is raised in this appeal. Consequently, there is no reason to assume the jury would have discredited Klassen's unchallenged testimony if CALCRIM No. 358 had been given. Therefore, it is not reasonably probable defendants would have obtained a more favorable verdict if CALCRIM No. 358 had been given and any error in failing to so instruct the jury was harmless. (Dickey, supra, 35 Cal.4th at p. 905.)

(Ex. A, pp. 11-12).

16

2.   <u>Federal Standard</u>

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in a federal habeas corpus action.  See <u>Estelle v. McGuire</u>, 502 U.S. 62, 71-72 (1991).  To obtain federal collateral relief for errors in the jury charge, the petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.  See <u>id</u>. at 72; <u>Waddington v. Sarausad</u>, 555 U.S. 179, 129 S.Ct. 823, 832, 172 L.Ed.2d 532 (2009); <u>Turner v. Calderon</u>, 281 F.3d 851, 865–66 (9th Cir.2002).

Moreover, a state trial court's *refusal* to give an instruction does not alone raise a ground cognizable in a federal habeas corpus proceedings. <u>Dunckhurst v. Deeds</u>, 859 F.2d 110, 114 (9th Cir.1988). The omission of an instruction is less likely to be prejudicial than a misstatement of the law. <u>Walker v. Endell</u>, 850 F.2d at 475–76 (citing <u>Henderson v. Kibbe</u>, 431 U.S. 145, 155 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977).  Thus, where, as here, the alleged error is the failure to give an instruction, the burden on the petitioner is "especially heavy."  <u>Henderson</u>, 431 U.S. at 155, ("An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law."); <u>accord Clark v. Brown</u>, 450 F.3d 898, 904 (9th Cir. as amended May 30, 2006); <u>Murtishaw v. Woodford</u>, 255 F.3d 926, 971 (9th Cir.2001); <u>Villafuerte v. Stewart</u>, 111 F.3d 616, 624 (9th Cir.1997). "The significance of the omission of such an instruction may be evaluated by comparison with the instructions that were given." <u>Henderson</u>, 431 U.S. at 156; <u>accord Murtishaw</u>, 255 F.3d at 971.  Even if an error occurred in instructing the jury, habeas relief will be granted only if the petitioner can establish that the error had a substantial and injurious effect or influence in determining the jury's verdict. <u>Hedgpeth v. Pulido</u>, 555 U.S. 57 (2008) (per curiam); <u>Brecht</u>, 507 U.S. at 637; <u>accord Clark</u>, 450 F.3d at 905.

3.   <u>Analysis</u>

Petitioner objected at trial to the giving of CALCRIM No. 357 regarding adoptive admissions but was overruled by the trial court.  As the 5th DCA noted, however, Petitioner's counsel did not make any subsequent request to give a modified version of the instruction.  Because of that omission, the 5th DCA considered the issue waived.  As discussed previously, failure to lodge a timely objection at trial is grounds for waiver of the claim on appeal in California.  <u>People v. Vera</u>, 15 Cal.4[th] at 275; <u>People v. Williams</u>, 16 Cal.4[th] at 208; <u>Melendez v. Pliler</u>, 288 F.3d at 1125.  Thus, federal review of the claim as

1   to CALCRIM No. 357 is barred.

2       As to the court's failure to give CALCRIM No. 358, the 5th DCA noted that the defense did not

3   challenge the credibility of the police officer testifying to Petitioner's incriminating statement, so "there

4   is no reason to assume the jury would have discredited Klassen's unchallenged testimony if CALCRIM

5   No. 358 had been given."  On this basis the state court found any error to be harmless.

6       On habeas review, this Court must determine whether there is any "clearly established" federal

7   law, as determined by the United States Supreme Court, holding that the United States Constitution

8   requires a state judge to instruct on certain issues in the absence of a defense request for the same.

9   Petitioner does not cite, and the Court is unaware of, any such "clearly established" Supreme Court

10  law.  In the absence of such a standard, no habeas relief is possible.  28 U.S.C. § 2254(d).

11          E       Sufficiency Of The Evidence

12      Finally, Petitioner argues that insufficient evidence was presented regarding his multiple

13  convictions for assault with a firearm because it was not proven that he had knowledge of all of the

14  occupants of the dwelling.  Petitioner also contends that insufficient evidence was presented on the

15  charge of shooting from a motor vehicle because it was not established that Petitioner and his

16  accomplices aimed at specific individuals.  Neither of these claims has any merit.

17          1.  The 5th DCA's Opinion.

18  Defendants claim there was insufficient evidence to support the multiple assault with a firearm
    convictions because there was no evidence they had knowledge of all the occupants in the
19  house at the time they committed the drive-by shooting, the gun was not powerful enough to
    penetrate the walls of the house, and the gun held only six bullets. In essence, they are
20  contending that they had to have specific knowledge of the presence of all the occupants in the
    house and the present ability to inflict injury on all eight occupants in order to sustain the
21  convictions.

22  Defendants also challenge the sufficiency of the evidence to support the shooting from a motor
    vehicle convictions because they did not aim at a specific person, which they contend is
23  required by section 12034, subdivision (c).

24  **Standard of review**

25  In reviewing a challenge to the sufficiency of the evidence, we consider the evidence in a light
    most favorable to the judgment and presume the existence of every fact the trier reasonably
26  could deduce from the evidence in support of the judgment. "The test is whether substantial
    evidence supports the decision, not whether the evidence proves guilt beyond a reasonable
27  doubt." (People v. Mincey (1992) 2 Cal.4th 408, 432; see also People v. Hayes (1990) 52
    Cal.3d 577, 631; People v. Johnson (1980) 26 Cal.3d 557, 576.)  Our sole function is to
28  determine if any rational trier of fact could have found the essential elements of the crime

18

beyond a reasonable doubt. (<u>People v. Marshall</u> (1997) 15 Cal.4th 1, 34; <u>People v. Ochoa</u> (1993) 6 Cal.4th 1199, 1206; <u>People v. Barnes</u> (1986) 42 Cal.3d 284, 303.) "''''If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.''' [Citations.]'' [Citation.]" (<u>People v. Rodriguez</u> (1999) 20 Cal.4th 1, 11.)

**The assault convictions**

A conviction for a violation of section 245, subdivision (a)(2) requires proof that (1) a person willfully committed an act which, by its nature, probably and directly would result in the application of physical force on another person; (2) the person committing the act was aware of facts that would lead a reasonable person to realize that, as a direct, natural, and probable result of this act, physical force would be applied to another person; (3) at the time the act was committed, the person committing the act had the present ability to apply physical force to the person of another; and (4) the assault was committed with a firearm. (CALCRIM No. 875.)

Defendants have mistakenly equated present ability to commit a violent injury with specific intent to injure another. The crime of assault does not require a specific intent to cause another injury or even a subjective awareness of the risk that an injury might result from the defendant's conduct. In <u>People v. Williams</u> (2001) 26 Cal.4th 779 (<u>Williams</u>), the California Supreme Court determined the mental state that is necessary to commit this crime:

> "Accordingly, we hold that assault does not require a specific intent to cause injury or a subjective awareness of the risk that an injury might occur. Rather, assault only requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another." (<u>Id</u>. at p. 790.)

It is not necessary to point a firearm directly at the victim in order to commit an assault with a firearm. (<u>People v. Raviart</u> (2001) 93 Cal.App.4th 258, 263.) The act of drawing a gun into a position in which it could be used when a person is within its range is sufficient to support an assault conviction. (<u>Id</u>. at p. 266.)

In <u>People v. Lathus</u> (1973) 35 Cal.App.3d 466, this court upheld an assault with a firearm conviction where the defendant, who was a passenger in a moving vehicle, fired at a stalled vehicle. One of the bullets struck a person standing outside the stalled vehicle. The defendant claimed he did not know anyone was near the vehicle and therefore lacked knowledge that he was endangering anyone. This contention was rejected. We explained: "[W]hen an act inherently dangerous to others is committed with a conscious disregard of human life and safety, the act transcends recklessness, and the intent to commit the battery is presumed; the law cannot tolerate a deliberate and conscious disregard of human safety." (<u>Id</u>. at p. 470.)

In <u>People v. Thompson</u> (1949) 93 Cal.App.2d 780, evidence showing that the defendant pointed a revolver toward two sheriff's deputies, aiming the gun between them while pointing the gun downward, was sufficient to support an assault with a firearm conviction because the gun "was in a position to be used instantly." (<u>Id</u>. at p. 782.)

In <u>Williams</u>, the court clarified "that assault requires actual knowledge of the facts sufficient to establish that the defendant's act by its nature will probably and directly result in injury to another." (<u>Williams, supra</u>, 26 Cal.4th at p. 782.) "[A] defendant is only guilty of assault if he intends to commit an act 'which would be indictable [as a battery], if done, either from its own character or that of its natural and probable consequences.' [Citation.] Logically, a defendant cannot have such an intent unless he actually knows those facts sufficient to establish that his act by its nature will probably and directly result in physical force being applied to another,

19

i.e., a battery. [Citation.] In other words, a defendant guilty of assault must be aware of the facts that would lead a reasonable person to realize that a battery would directly, naturally and probably result from his conduct." (Id. at pp. 787–788.)

In People v. Trujillo (2010) 181 Cal.App.4th 1344 (Trujillo), the appellate court held that "a defendant who harbors the requisite mental state for assault while committing one or more acti rei such that a direct, natural, and probable result is a battery against two persons may be convicted of assault against each." (Id. at p. 1354.) As the Trujillo court noted, "the gravamen of assault is the likelihood that the defendant's action will result in a violent injury to another" and "it follows that a victim of assault is one for whom such an injury was likely." (Id. at p. 1355.)

The drive-by shooting here was committed around 4:00 p.m. on June 23, 2008, a Monday. There were several cars parked in front of the Valdovinos house at the time shots were fired. It was obvious the location of the house was in a residential neighborhood. Defendants were aware people lived at the house; they believed the people who lived there had shot one of their "homies." Six shots were fired from a .357 revolver directly toward the house. Two cars in front of the house suffered direct hits. Three bullets were fired toward the north side of the house and the kitchen.

Defendants committed multiple acti rei when they fired six shots at the Valdovinos residence. The bullets from the .357 revolver could have penetrated a window and injured or killed any one of the people inside, contrary to Ramirez's allegation. One of the bullets penetrated the garage and nearly hit Salina E. One bullet landed in the minivan parked directly in front of the living room window. Had the bullet instead penetrated the living room window, Maria and/or her baby could have been shot. Raquel, Jose, and Jesus were in the kitchen, which had a window facing the street on which defendants' car traveled. Juan Carlos and Max were in the backyard, protected only by a chainlink fence, and could see the street in front of the house. *8

Contrary to the claim of the defendants, the bullets were capable of, and did, penetrate the walls of the residence in that one bullet pierced the garage wall. A defendant who fires multiple wall-piercing bullets at a residence where he knows multiple family members reside, clearly knows that his acts will probably result in a violent injury to the occupants and it can be inferred that he intended such a result. (Trujillo, supra, 181 Cal.App.4th at pp. 1354–1355.)

Furthermore, defendants' contention that the number of assault charges is correlated to the number of bullets fired has been rejected multiple times by multiple courts, and we reject it here. (See, e.g., People v. Chinchilla (1997) 52 Cal.App.4th 683, 690–691.)

**The shooting from a motor vehicle convictions**

The defendants' contention that they must have shot at a specific person from their vehicle in order to be convicted of shooting from a motor vehicle has been rejected by this court and we do so again here.

In People v. Hernandez (2010) 181 Cal.App.4th 1494, this court held that a violation of section 12034, subdivision (c) does not require a specific intent to shoot at a particular person. We held that the statute requires only shooting from a motor vehicle under facts or circumstances that indicate a conscious disregard for the probability that such a result will occur. (Hernandez, at pp. 1500–1502.) The term "at another person" includes the act of shooting "'in such close proximity to the target that he shows a conscious indifference to the probable consequence that one or more bullets will strike the target or persons in or around it.'" (Id. at p. 1501.)

Here, defendants willfully and maliciously discharged a firearm six times from a motor vehicle at an occupied residence, which constitutes circumstances showing a conscious disregard for

20

1
the probability such a result, shooting at a person, will occur. Moreover, assault with a firearm is not a lesser included offense of shooting from a motor vehicle; hence, convictions for both crimes stand. (People v. Licas (2007) 41 Cal.4th 362, 370–371.)

2

3
(Ex. A, pp. 7-9).

4
2.    Federal Standard

5
The law on sufficiency of the evidence is clearly established by the United States Supreme

6
Court.  Pursuant to the Supreme Court's holding in Jackson v. Virginia, 443 U.S. 307, 319. the test on

7
habeas review to determine whether a factual finding is fairly supported by the record is as follows:

8
"[W]hether, after viewing the evidence in the light most favorable to the prosecution, any rational trier

9
of fact could have found the essential elements  of the crime beyond a reasonable doubt." See also

10
Lewis v. Jeffers, 497 U.S. 764, 781 (1990).  Thus, only if "no rational trier of fact" could have found

11
proof of guilt beyond a reasonable doubt will a petitioner be entitled to habeas relief.  Jackson, 443 U.S.

12
at 324.   Sufficiency claims are judged by the elements defined by state law.  Id. at 324, n. 16.

13
A federal court reviewing collaterally a state court conviction does not determine whether it is

14
satisfied that the evidence established guilt beyond a reasonable doubt.  Payne v. Borg, 982 F.2d 335,

15
338 (9th Cir. 1992).  The federal court "determines only whether, 'after viewing the evidence in the

16
light most favorable to the prosecution, any rational trier of fact could have found the essential elements

17
of the crimes beyond a reasonable doubt.'" See id., quoting Jackson, 443 U.S. at 319.  Only where no

18
rational trier of fact could have found proof of guilt beyond a reasonable doubt may the writ be granted.

19
See Jackson, 443 U.S. at 324; Payne, 982 F.2d at 338.

20
If confronted by a record that supports conflicting inferences, a federal habeas court "must

21
presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such

22
conflicts in favor of the prosecution, and must defer to that resolution."  Jackson, 443 U.S. at 326.  A

23
jury's credibility determinations are therefore entitled to near-total deference.  Bruce v. Terhune, 376

24
F.3d 950, 957 (9th Cir. 2004).  Except in the most exceptional of circumstances, Jackson does not

25
permit a federal court to revisit credibility determinations.  See id. at 957-958.

26
Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a

27
conviction.  Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).  However, mere suspicion and

28
speculation cannot support logical inferences.  Id.; see, e.g., Juan H. v. Allen, 408 F.3d 1262, 1278-

1    1279 (9th Cir. 2005)(only speculation supported conviction for first degree murder under theory of

2    aiding and abetting).

3           After the enactment of the AEDPA, a federal habeas court must apply the standards of <u>Jackson</u>

4    with an additional layer of deference.  <u>Juan H.</u>, 408 F.3d at 1274.  Generally, a federal habeas court

5    must ask whether the operative state court decision reflected an unreasonable application of <u>Jackson</u>

6    and <u>Winship</u> to the facts of the case.  <u>Id</u>. at 1275.[2]  Moreover, in applying the AEDPA's deferential

7    standard of review, this Court must also presume the correctness of the state court's factual findings.

8    28 U.S.C. § 2254(e)(1); <u>Kuhlmann v. Wilson</u>, 477 U.S. 436, 459 (1986).  This presumption of

9    correctness applies to state appellate determinations of fact as well as those of the state trial courts.

10   <u>Tinsley v. Borg</u>, 895 F.2d 520, 525 (9th Cir.1990).  Although the presumption of correctness does not

11   apply to state court determinations of legal questions or mixed questions of law and fact, the facts as

12   found by the state court underlying those determinations are entitled to the presumption.  <u>Sumner v.</u>

13   <u>Mata</u>, 455 U.S. 539, 597, 102 S.Ct. 1198 (1981).

14          In <u>Cavazos v. Smith</u>, __U.S. __, 132 S.Ct. 2 (2011), the Supreme Court further explained the

15   highly deferential standard of review in habeas proceedings, by noting that <u>Jackson,</u>

16       makes clear that it is the responsibility of the jury—not the court—to decide what conclusions
     should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's
17   verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed
     with the jury. What is more, a federal court may not overturn a state court decision rejecting a
18   sufficiency of the evidence challenge simply because the federal court disagrees with the state
     court. The federal court instead may do so only if the state court decision was "objectively
19   unreasonable." <u>Renico v. Lett</u>, 559 U.S. ——, ——, 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678
     (2010) (internal quotation marks omitted).
20
         Because rational people can sometimes disagree, the inevitable consequence of this settled law
21   is that judges will sometimes encounter convictions that they believe to be mistaken, but that
     they must nonetheless uphold.
22

23   <u>Cavazos</u>, 132 S.Ct. at 3.

24       "<u>Jackson</u> says that evidence is sufficient to support a conviction so long as 'after viewing the
     evidence in the light most favorable to the prosecution, any rational trier of fact could have
25   found the essential elements of the crime beyond a reasonable doubt.'  443 U.S., at 319, 99
     S.Ct. 2781.  It also unambiguously instructs that a reviewing court "faced with a record of
26

27   _____
     [2] Prior to <u>Juan H.</u>, the Ninth Circuit had expressly left open the question of whether 28 U.S.C. § 2254(d) requires an
28   additional degree of deference to a state court's resolution of sufficiency of the evidence claims.  <u>See</u> <u>Chein v. Shumsky</u>,
     373 F.3d 978, 983 (9th Cir. 2004); <u>Garcia v. Carey</u>, 395 F.3d 1099, 1102 (9th Cir. 2005).

1

historical facts that supports conflicting inferences must presume—even if it does not
affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of
the prosecution, and must defer to that resolution." Id., at 326, 99 S.Ct. 2781.

2

3

Cavazos, 132 S.Ct. at 6. [3]

4

3.    Analysis

5

As is clear from the 5th DCA's decision, the state court understood Petitioner's argument to

6

essentially add an element to the state statute defining shooting at an inhabited dwelling, i.e., that the

7

accused must have specific knowledge of the presence of each victim.  Contrary to Petitioner's

8

argument, the 5th DCA interpreted Cal. Pen. Code § 245(a)(2) as not requiring such specific knowledge

9

of each of the victims.  Rather, the state court held that the only requirements were an intentional act

10

and actual knowledge of those facts sufficient to establish that the act by its nature "will probably and

11

directly result in the application of force against another."  (Ex. A, p. 6).  The court pointed out that a

12

defendant who fires multiple "wall-piercing bullets at a residence where he knows multiple family

13

members reside, clearly knows that his acts will probably result in a violent injury to the occupants and

14

it can be inferred that he intended such a result."  Implicit in the state court's construction of the statute

15

is that it need not be proven that the accused had actual knowledge of all victims.  Nor did the state

16

court accept Petitioner's contention that the number of bullets fired at the dwelling was relevant to

17

proving any of the elements of the charge, noting that this argument had been rejected by California

18

courts multiple times.

19

As discussed previously, this Court is bound by a state court's construction of its own statutes.

20

Estelle, 302 U.S. at 67-68; Aponte v. Gomez, 993 F.2d 705, 707 (9th Cir. 1993); Oxborrow v.

21

Eikenberry, 877 F. 2d 1395, 1399 (9th Cir. 1989).  Moreover, even if Petitioner's claim could be

22

construed as arguing that the state court improperly applied its own laws, this too would fail to raise a

23

cognizable federal habeas claim.  The only basis for a federal habeas claim in the context of sufficiency

24

of the evidence is that the state court adjudication was contrary to or was an unreasonable application of

25

26

27

28

[3] To the extent that the 5th DCA's opinion does not expressly cite the Jackson v. Virginia standard in analyzing the
sufficiency claims herein, it must be noted that, long ago, the California Supreme Court expressly adopted the federal
Jackson standard for sufficiency claims in state criminal proceedings.  People v. Johnson, 26 Cal.3d 557, 576 (1980).
Accordingly, the state court applied the correct legal standard, and this Court's only task is to determine whether the state
court adjudication was contrary to or an unreasonable application of that standard.

23

Jackson.  28 U.S.C. § 2254(d).  Petitioner has not made this claim.  Accordingly, there is no basis upon which to afford habeas relief.

## **RECOMMENDATION**

Accordingly, the Court RECOMMENDS that Petitioner's Petition for Writ of Habeas Corpus (Doc. 1), be DENIED with prejudice.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to this case, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  **Within 21 days** after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and **filed within 10 days** (plus three days if served by mail) after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **March 16, 2016**                       **/s/ Jennifer L. Thurston**
                                                  UNITED STATES MAGISTRATE JUDGE

24